KENNETH WIMER v. THE STATE.

No. 14590.   Delivered April 6, 1932.

The opinion states the case.

*J. Franklin Spears* and *Dave Watson,* both of San Antonio, attorneys for appellant, contended, among other things:

First: That the indictment was defective because, in traversing and denying the truth of the representations, that the notes securing the investment certificates only alleged that the notes were at the time held by the Alamo National Bank to secure another and different indebtedness and failed to set out with any definiteness the nature and character of the alleged other indebtedness: Allen v. State, 261 S. W., 770; Moore v. State, 197 S. W., 728; Sasse v. State, 22 S. W. (2d) 941; Luce v. State, 214 S. W., 1095; Wills v. State, 6 S. W., 316; McElroy v. State, 150 S. W., 797; Martin v. State, 38 S. W. (2d) 791; Jones v. State, 36 S. W. (2d) 587; Legrone v. State, 12 Texas App., 426; Turner v. State, 30 Texas App., 691.

Second: On the proposition that there appears to be no natural connection between the alleged false pretense and the delivery, or obtaining property, such additional facts as are necessary to show the relationship must be alleged. Farmer v. State, 213 S. W., 669; Moore v. State, 45 S. W., 573; Hurst v. State, 45 S. W., 573; Robinson v. State, 132 S. W. 354; State v. Biggerly, 21 Texas, 757.

Third: That there is a variance between the allegations of the indictment and the proof, in that the indictment alleges that money was obtainied by reason of the false representations, whereas, the proof shows that the injured party gave a check payable to the corporation of which appellant was president, and not to him personally.

Fourth: That the court should have charged upon circumstantial evidence. Nichols v. State, 44 S. W., 1091; Johnson v. State, 200 S. W., 522; Ireland v. State, 292 S. W., 181; Carrell v. State, 184 S. W., 191.

*Walter Tynan,* District Attorney, of San Antonio, and *Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

On the question of variance the following cases were cited: Raymond v. State, 33 S. W. (2d) 192; Ratcliff v. State, 38 S. W. (2d) 326; Groves v. State, 19 S. W., 895.

CHRISTIAN, JUDGE.—The offense is swindling; the punishment, confinement in the penitentiary for ten years.

Appellant was president of Wimer-Richardson & Company, a corporation, with its place of business in San Antonio, Texas. Under the authority of its charter the company from time to time issued its own interest-bearing investment certificates for sale to the public. In issuing these certificates, the corporation signed in trust notes, secured by first liens on real estate, the purpose of a given assignment being to segregate from the general assets of the corporation the notes described in the assignment, in order that the purchasers of investment certificates of the series to which the assignment related might have security for the payment of interest and the retirement of such certificates. The corporation collected the assigned notes and created from their proceeds a fund for the retirement of the investment certificates. The right to substitute other notes for the assigned notes was reserved by the corporation. The investment certificates were issued in series, each series being supported by an assignment in trust of notes, the trust agreement being executed at the time the series was issued. The corporation transacted its banking business with Alamo National Bank of San Antonio. It was a borrower of large sums of money from the bank, to secure which first lien notes on real estate were delivered to the bank as collateral. In its general course of dealing with the bank, the corporation was permitted to withdraw from the bank such notes as it desired to assign in trust in support of the issuance of a given series of certificates, and to substitute for the notes withdrawn other notes of equal value. On August 1, 1929, Wimer-Richardson & Company issued 100 investment certificates, series No. 43, aggregating the sum of $50,000, and at the same time executed a trust agreement in which the company purported to assign in trust eight promissory notes as security for the payment of the certificates.

It was recited in the assignments, in substance, that it was the intention of the corporation that each of the investment certificates of the series under consideration should constitute an assignment to any holder of a certificate of such series of an interest to the extent of the face value thereof in all of the first lien notes described in the trust agreement. Further, it was recited that it was the desire of the corporation, in executing the trust agreement, to segregate the notes

described in the agreement from the assets of the corporation in such manner that the holders of the investment certificates should hold their interest clear of any liability that might thereafter attach to the assets of the company. The notes purporting to be assigned to secure the payment of the certificates in series No. 43 aggregated $51,762.50. Among these notes were four notes in the aggregate of approximately $25,000. The testimony on the part of the state tended to show that the notes last mentioned had been deposited by the corporation with the Alamo National Bank prior to the execution of the assignment in support of series 43 as collateral to secure certain indebtedness of the company, and that such notes had been held by the bank as collateral continuously from the date of their delivery until the date of the trial herein,—the 9th day of March, 1931. The amount owed the bank by Wimer-Richardson & Company was approximately $140,000, and the collateral notes held by the bank belonging to Wimer-Richardson & Company aggregated $237,000. Touching the custom to substitute notes held by the bank as collateral, a witness for the state, who was note teller of the Alamo National Bank, testified as follows: "At the time of the transactions of the Wimer-Richardson & Company we did not keep up our records like we do now, and I do not know just why the officials did it that way. One of the officers would pass on all the substitutions and they were continually substituting new notes during the time that is covered here during 1928 and 1929, and we would make little slips that they substituted in place of the collateral and showing what was substituted, and we did that when any of the officials would pass on a loan as that given in and taken out the collateral. They were permitted by the bank, if they wanted certain notes, to bring other notes and they were permitted to take these notes down and the officials would pass on it. * * * It was the custom when they made a substitution that we hold these slips. I may not have handled the transaction at all and I have no way of showing how many notes were taken down and substituted or put up, and have no books to show that, but it was our custom to hold these slips, and I don't remember when these notes that I have testified about were put up or taken down, and do not remember anything about it."

The testimony of the state tended to show that notes were substituted under the orders of appellant. Appellant's voluntary statement before the grand jury, which was introduced in evidence by the state, was to the effect that he had actual control over the affairs of Wimer-Richardson & Company and that he dictated the policy of the company. Referring to another officer of the corporation, appellant testified before the grand jury that he and such officer from time to time conferred about transactions pertaining to the business of the company. However, he said: "However, I made nearly all the transactions. I never told a bookkeeper or anyone to make a wrong entry on the books.

The fact of the matter is we did not allow them to even erase a mistake in the books. If they made an error in the entries, they put the corrections in so the error would show and could be traced." Further, as to the authority under which substitution of the notes was made, a witness for appellant, who was an officer of the corporation, testified: "We substituted notes placed with the Alamo National Bank at various times, by sending over notes of equal amounts to the notes we wished to take down, which custom prevailed, to my knowledge, as long as I was there. As to who usually made requests for substitutions, it depended upon whose particular business it was. If Mr. Wimer (appellant) wanted or had a note that he wanted to take down, he would instruct me to make out a request, and if I had one, I would make out the request. It depended on whose business it was."

Again, this witness said: "I do not remember of ever having made any substitution of any note which was put up to secure a certificate except with Mr. Wimer's orders. Mr. Wimer ordered those substitutions."

The witness last mentioned testified, further, that he had no independent recollection of having substituted any of the notes relating to the issuance of the investment certificates, series No. 43. Touching the selection of the notes assigned in trust to support the issuance of series 43, the witness testified as follows: "We had two sets of notes. One box was certificate notes and another box was free notes. Free notes was substituted at will, but certificate notes we didn't substitute except by orders of Mr. Wilmer (appellant). I imagine that I picked out the notes in series 43. Ordinarily, Mr. Wilmer (appellant) would decide the ones, when he wished a new series, but it is my recollection that I selected them in that series. I do not recall that particular series, but I imagine I did."

Louis Pape, the injured party, testified that on September 11, 1929, he bought five investment certificates out of series 43, giving appellant a check for $3,023.23, payable to Wimer-Richardson & Company, which check represented the price he paid for the certificates. He testified, in effect, that appellant induced him to buy the certificates by representing to him that Wimer-Richardson & Company had assigned in trust the eight notes heretofore mentioned, aggregating $51,762.50, for the purpose of creating and holding funds for the retirement and payment of the 100 investment certificates in series 43, aggregating $50,000. The witness said he read one of the certificates and observed its terms, as well as the terms of the trust agreement. He testified, further, that his statement from the City-Central Bank and Trust Company of San Antonio showed that the check he had delivered to appellant had been paid on September 12, 1929. About October 22, 1929, Wimer-Richardson & Company were placed in the hands of a receiver. Mr. Pape was holding his investment certificates on the date of the trial, not having been able to cash them.

The indictment sets forth the alleged false representations as follows: "The said Kenneth Wimer represented to the said Louis Pape that Wimer-Richardson & Company, Incorporated, had assigned in trust eight (8) certain principal promissory notes with Wimer-Richardson & Company, as trustee, for the purpose of creating and holding funds for the retirement and payment of certain investment certificates issued by Wimer-Richardson & Company, said investment certificates being series No. forty three (43) and being numbered from one to one hundred inclusive (1 to 100), and dated August 1, 1929. The said certificates being for various amounts. The said Kenneth Wimer represented to the said Louis Pape that the notes hereinabove referred to and hereinafter described were assigned in trust for the purpose of creating a fund for the payment and retirement of the investment certificates issued by Wimer-Richardson & Company, series No. 43, when same were due and payable, principal and interest, in accordance with the terms of a certain trust agreement."

Following the above, the trust agreement is set out in the indictment, it being shown therein that eight promissory notes, aggregating $51,762.50, secured by first liens on real estate, had been assigned and segregated from the general assets of Wimer-Richardson & Company, in order to secure the payment of the one hundred investment certificates of series 43, aggregating $50,000. The notes as well as the investment certificates, were described in detail in the trust agreement embraced in the indictment, it being shown therein that the notes were assigned in trust for the purpose of creating a fund for the payment and retirement of the investment certificates of series 43, when they became due and payable. After setting out the trust agreement, the certificates of series 43, and the eight assigned promissory notes, it is alleged: "The said Kenneth Wimer further represented to the said Louis Pape, that Wimer-Richardson & Company loan No. 2713, same being evidenced by one certain note for the sum of $3,625 same being hereinabove described, was assigned in trust, with Wimer-Richardson & Company, as trustee, for the purpose of creating a fund for the payment and retirement of certain investment certificates, when said certificates became due and payable, said certificates issued by Wimer-Richardson & Company and being series No. 43, same being hereinabove referred to and hereinafter described. The said Kenneth Wimer further represented to the said Louis Pape, that one certain note for the sum of $5,000, dated December 1, 1928, and signed by H. H. Harrison, same being Wimer-Richardson loan No. 2761, said note being hereinabove set out and marked exhibit 'A' was assigned in trust, with Wimer-Richardson & Company, as trustee, for the uses and purposes here set out: The assignment of the note hereinabove described, together with the lien securing its payment and the conveyance of the superior title and same is intended as a trust for the purpose of securing

the holders of the hereinafter described first mortgage investment certificates, series 43, to the extent of their respective interest in the proceeds thereof. The said Kenneth Wimer further represented to the said Louis Pape that one certain note for the sum of $12,000, Wimer-Richardson & Company loan No. 2873, had been assigned in trust with Wimer-Richardson & Company, as trustee, for the purpose of creating a fund for the payment and retirement of certain investment certificates issued by Wimer-Richardson & Company, same being series No. 43, when same, said certificates, became due and payable. Said Wimer-Richardson & Company loan No. 2873, being evidenced, however, by two certain notes for $6,000 each, and dated June 6, 1929, and signed by A. L. Smith, and Anna L. Smith, said notes being hereinabove set out and marked exhibit 'B.' All of the hereinabove described notes being secured by liens, so Kenneth Wimer represented to Louis Pape, on the property described on the back of the hereinafter described investment certificate, and reference is here made to same and same is hereby made a part hereof. The said Kenneth Wimer represented to the said Louis Pape that the total face value of all the notes placed in trust to secure the payment of series No. 43 investment certificates issued by Wimer-Richardson & Company and assigned for that purpose, amounted to $51,762.50. The said Kenneth Wimer by the aforesaid false pretenses and fraudulent representations, printed, written and verbal, as hereinbefore set out and also as hereinafter set out, did induce the said Louis Pape to part with the title and possession of the money hereinabove set out, same being the personal and movable property by him, the said Louis Pape. He, the said Louis Pape, relying on said representations and believing the said representations, written, printed and verbal, to be true, did part with the title and possession of said personal and movable property aforesaid, in exchange for five (5) Wimer-Richardson & Company investment certificates, series 43."

Following the above, the five certificates purchased by Mr. Pape are set forth in the indictment. Omitting the formal conclusion and signature of the foreman of the grand jury, we quote the remainder of the indictment, as follows: "Whereas in truth and in fact, the said Wimer-Richardson & Company, inc., had not assigned in trust eight (8) certain principal promissory notes with Wimer-Richardson & Company, as trustee, for the purpose of creating and holding funds for the retirement and payment when due of certain investment certificates, issued by Wimer-Richardson & Company, and being series No. 43. In truth and in fact the Wimer-Richardson & Company loan No. 2638, evidenced by a note and ten interest notes, said principal note being for $2,500, and signed by the Jourdan Campbell Land Syndicate, Inc., by Jourdan Campbell, president, was never assigned in trust with Wimer-Richardson & Company, as trustee, to pay and retire when due series No. 43, investment certificates issued by Wimer-Richardson & Company, as represented by the said Ken-

neth Wimer to the said Louis Pape. Said note was placed with the Alamo National Bank of San Antonio, San Antonio, Texas, as collateral on another and different indebtedness. In truth and in fact the $3,625.00 note, same being the evidence of Wimer-Richardson loan No. 2713, and hereinbefore described, was never assigned in trust with Wimer-Richardson & Company, as trustee, to create a fund to pay and retire series 43 investment certificates, issued by Wimer-Richardson & Company, as represented by the said Kenneth Wimer to the said Louis Pape, but said note was put up as collateral at the Alamo National Bank of San Antonio, San Antonio, Texas, on another and different indebtedness. In truth and in fact the $5,000 note hereinabove described, same being Wimer-Richardson loan No. 2761, was not assigned in trust with Wimer-Richardson & Company, as trustee, for the purpose of creating and holding funds for the purpose of paying and retiring series 43, investment certificates issued by Wimer-Richardson & Company, when due and payable, as represented by the said Kenneth Wimer to the said Louis Pape. Said note hereinabove set and marked exhibit 'A.' In truth and in fact the $12,000 note which Kenneth Wimer represented to the said Louis Pape was assigned in trust for the creating and holding a fund for the purpose of paying and retiring series 43 investment certificates issued by Wimer-Richardson & Company, when due did not exist in fact, but loan No. 2873 of Wimer-Richardson & Company was evidenced by two notes for $6,000 each, and neither of said notes was assigned in trust to Wimer-Richardson & Company, as trustee, to retire Wimer-Richardson & Company, investment certificates when same were due. Said notes were placed with the Alamo National Bank of San Antonio, Texas, as collateral on another and different indebtness. Said notes are hereinbefore set out and marked exhibit 'B.' The total amount of collateral assigned in trust was not $51,762.50 for the protection and retirement of the series No. 43 certificates, as represented by Kenneth Wimer to Louis Pape, but said collateral was $25,125 short, and the said Kenneth Wimer at the time said pretenses and fraudulent representations were made by him to the said Louis Pape, knew that said pretenses and representations were false and untrue, and the same were false and untrue."

A motion to quash the indictment was predicated upon several grounds, the chief criticism being that, in traversing the truth of the representations, it was in effect alleged that they were untrue, without setting out the facts showing their falsity. In other words, it is appellant's contention that the pretenses were of such nature that the negation of the truth thereof required allegaions showing affirmatively in what the falsehood consisted in order to apprise him of the evidence he had to meet. In the motion to quash, appellant called attention to the fact that as to four of the notes embraced in the trust agreement, the pleader, in traversing the truth of the representations as to each note, merely averred, in

effect, after describing the note, that it was never assigned in trust with Wimer-Richardson & Company, for the reason that said note was placed with the Alamo National Bank of San Antonio, Texas, as collateral on another and different indebtedness. The motion went specifically to the point that the date the notes had been placed with the Alamo National Bank was not shown; that the indebtedness was in no manner described; and that there was no direct averment that the debt which it was charged was secured by the notes was existent and unpaid.

It is the general rule that an averment that the pretenses were false is sufficient negation of the truth of the pretenses, unless the pretense is of such nature that the negation of the truth thereof requires allegations showing affirmatively in what the falsehood consisted, in order that the accused may be apprised of the evidence he must meet. 25 Corpus Juris, p. 627; Raymond v. State, 116 Texas Crim. Rep., 595, 33 S. W. (2d) 192. In the present case, the allegations in the indictment show that four of the notes described in the trust agreement were in fact assigned in accordance with the terms of the agreement, and that appellant's representations concerning these four notes were not false. The alleged falsity, as shown in the indictment, related to four notes aggregating approximately $25,000, which, according to the traverse clause, had not been assigned as represented by appellant and as shown in the trust agreement, by virtue of the fact that they were placed with the Alamo National Bank of San Antonio, as collateral on another and different indebtedness. The indictment alleges: "The total amount of collateral assigned in trust was not $51,762.50 for the protection and retirement of the series 43 certificates, as represented by Kenneth Wimer to Louis Pape, but said collateral was $25,125 short." Thus the indictment advises one that four notes in the approximate sum of $26,000 had been assigned, as represented to the injured party by appellant, while four notes of the approximate sum of $25,000 had not been assigned, as represented by appellant, notwithstanding the fact that such notes were owned by Wimer-Richardson & Company any were embraced in the trust agreement with the notes in fact assigned. In the absence of conditions peculiar to the four notes alleged not to have been assigned, it would seem from the averments in the indictment that the trust agreement would have been as efficacious in assigning such notes as in the case of the four notes, which, according to the averments, were admittedly assigned by said trust agreement. It follows that if the notes alleged not to have been assigned had been in the same attitude as those assigned, no basis for the charge against appellant would have existed. The pleader having drawn the indictment on the hypothesis that the trust agreement was valid in its relation to part of the notes' described therein, necessarily was required to embrace averments in the indictment showing that the other notes owned by Wimer-Richardson & Company and described in the trust agreement, were in fact not within

the operation of such agreement. In view of what we have said, the opinion is expressed that, in traversing the representation that the four notes in question had been assigned, the mere statement that they had not been assigned would have been insufficient. Looking to such statement, appellant, being presumptively innocent, would have been apprised of no fact which differentiated the notes alleged to have been assigned from the other notes described in the trust agreement. The conclusion is inescapable that it was necessary, in traversing the truth of the representation as the four notes in question, to embrace in the indictment allegations showing affirmatively in what the falsehood consisted. The state undertook to meet this requirement by stating that the notes had not been assigned and by further averring: "Said notes were placed with the Alamo National Bank of San Antonio, Texas, as collateral on another and different indebtedness." Thus the state attempted to traverse the truth of the representations by alleging that another lien existed on the notes. .

The opinion is expressed that the negative allegations were not sufficiently specific. They embraced no direct averment that the debt which it was charged was secured by the notes was existent and unpaid. The date the notes were placed as collateral with Alamo National Bank was not averred. From the allegations in the traverse clause it cannot be determined whether the notes were pledged with Alamo National Bank prior or subsequent to the issuance of the investment certificates of series 43. The indictment contains no allegations showing the amount or approximate amount of the debt owed by the corporation to Alamo National Bank. The terms of the collateral agreement, under which the lien attached, were not in any manner alleged. In other words, there were no sufficient allegations showing affirmatively in what the falsehood consisted. In Allen v. State, 97 Texas Crim. Rep., 343, 261 S. W., 770, the representations were to the effect that other than a prior lien to secure an indebtedness of $2,000 there was no lien or incumbrance against the land described in the vendor's lien the accused sold the injured party. In drawing the indictment in Allen's Case the pleader contented himself with traversing the truth of the representation with the statement that it was untrue. In reaching the conclusion that the indictment should be quashed, this court, speaking through Presiding Judge Morrow, said:

"In the present case, the traversing averment goes no farther than to say that the representation that there was but a $2,000 prior lien was untrue. This involves but the conclusion of the pleader. It fails to give any facts advisory of the nature of the proof to be relied upon touching either the amount or the nature of any additional liens, and is silent as to facts going to show that there were additional liens which might have affected the rights of Earnest as the holder of the $15,000 notes described in the indictment. If it be sound to say, as was said by this court in the Graves Case, supra (31 Texas Crim. Rep., 65, 19 S. W., 895), that to

render the representation that the real estate conveyed was unincumbered a basis for a charge of swindling, it must be shown by averment, not only that the representation was false, but that the lien was in its nature one which might injure the person who acted upon the representation. It would seem to follow that in the present case, the nature and the amount of the lien, should be set out in the indictment."

In the case of Keller v. State, 51 Ind., 111, the indictment charged that Keller had obtained property by false pretenses. It was averred that he had represented to the injured party that he (Keller) had been the owner of certain real estate which was described, and that he had sold the real estate for $3,500 and obtained a lien for the sum of $500, "and that there was no lien or incumbrance upon the said house and lot of ground except the said lien of $500." Upon this representation the injured party exchanged property with Keller, and acquired the loan for $500, and the mortgage securing it. In traversing the truth of the averment, it was alleged in the indictment, in substance, that said lien was not the only lien incumbrance then upon said house, but that there were various and numerous other liens thereon older and prior to said lien of $500, amounting in the aggregate to $2,000. In reaching the conclusion that the indictment should be quashed, the court used language as follows: "The fourth averment and its negation are insufficient. The negation to the fourth averment does not set out or describe the liens that constituted the prior incumbrances. How was it possible for the appellant to prepare for trial under such an averment and negation? How could he show, on trial, that the liens proved by the state had no valid existence, or had been paid off? He would have no notice of the liens relied upon until the evidence was offered by the state. It would be contrary to well-established principles to allow evidence to be given upon a material issue tending to fasten fraud and falsehood upon the party, without any averment or notice in the indictment of the offense sought to be proved. People v. Miller, 2 Parker Cr. R. [N. Y.], 197." See, also, Moore v. State, 81 Texas Crim. Rep., 606, 197 S. W., 728.

Under our statute all that is essential to constitute the offense must be sufficiently charged and cannot be aided by intendment. The facts constituting the offense must be set forth so that the conclusions of law may be arrived at from the facts so stated. Articles 396 and 397, C. C. P.; Ford v. State, 108 Texas Crim. Rep., 626, 2 S. W. (2d) 265. While the law does not require minuteness of detail, it demands that the particular offense be set out with such certainty that a presumptively innocent man, seeking to know what he must meet, may ascertain fully therefrom the matters charged against him. Ford v. State, supra; Harden v. State, 85 Texas Crim. Rep., 220, 211 S. W., 233, 4 A. L. R., 1309; Middleton v. State, 114 Texas Crim. Rep., 263, 25 S. W. (2d) 614; Jones v. State, 118 Texas Crim. Rep., 106, 38 S. W. (2d) 587.

Giving effect to the principles controlling, the opinion is expressed that the motion to quash should have been sustained.

Appellant timely and properly objected to the charge of the court for its failure to embrace an instruction covering the law of circumstantial evidence. We think the state relied entirely upon circumstantial evidence to prove the main fact. Appellant did not personally place the notes in Alamo National Bank as collateral to secure a loan of Wimer-Richardson & Company. That they were pledged under appellant's orders was shown circumstantially in the testimony of J. H. Haile, an employee of Wimer-Richardson & Company. This witness testified that notes that had not theretofore been assigned to secure an issue of certificates were substituted at will, but that certificate notes were not substituted except by order of appellant. The state's testimony showed that the notes in question were free from incumbrance at the time they were deposited in the Alamo National Bank. Hence, only circumstantially was it shown that appellant knew that such notes had been substituted for other notes in the bank. The employee of Wimer-Richardson & Company who placed the notes in the Alamo National Bank testified for the state that she did so under the orders of the witness Haile. Appellant's voluntary statement before the grand jury was to the effect that he kept in touch with the transactions of his company and dictated its policies. He did not testify that he knew that the notes supporting the investment certificates in series 43 had theretofore been pledged to Alamo National Bank. Again, the establishment of the fact that the notes were held by Alamo National Bank as collateral security on the date the investment certificates in series 43 were issued depended upon inferences to be drawn from the testimony that they had prior to said date been deposited in the bank. The officials of the Alamo National Bank were unable to say that the notes were held by them when the investment certificates in question were issued. No witnesses who had worked for Wimer-Richardson & Company were able to testify directly that said notes were in the Alamo National Bank on the occasion in question. They were only able to state that the data pertaining to said notes indicated that they were so held by Alamo National Bank on the date the certificates were issued. Appellant's relation to the transaction was proved as a matter of inference from other facts in evidence. The fact that the representations were false at the time he made them, and also the further fact of appellant's knowledge of their falsity were clearly dependent for establishment upon circumstances. Branch's Annotated Penal Code, sec. 1873; King v. State, 113 Texas Crim. Rep., 130, 19 S. W. (2d) 52.

The indictment charged that appellant obtained from Mr. Pape $3,023.23, money of the United States, while the evidence showed that he received a check on the City-Central Bank and Trust Company of San Antonio for the amount of $3,023.23, which he deposited in the Alamo

National Bank to his credit and which was thereafter paid by the City-Central Bank and Trust Company. Appellant contends that there was a fatal variance between the allegations of the indictment and the proof with respect to the property obtained by him from the injured party. In the case of Lieske v. State, 60 Texas Crim. Rep., 276, 131 S. W., 1126, the indictment alleged that the accused secured $250 in money of the United States upon false representations, while the proof showed that the injured party delivered a check to him in the sum of $250. There was no proof that the check had been taken to the bank and cashed. This court held that there was a fatal variance between the allegation in the indictment and the proof as to the property acquired. In Robinson v. State, 63 Texas Crim. Rep., 212, 139 S. W., 978, 980, it was alleged that the accused by means of false representations obtained current money of the United States of America. The proof showed that the injured party delivered a check to the accused, which he took to the bank and cashed in the presence of the injured party. In reaching the conclusion that no variance was presented, this court said: "Article 945 (now 1547, P. C., 1925) of the Penal Code of 1895, defining swindling, provides: 'Within the meaning of "money," as used in this chapter, are included also bank bills and other circulating medium current as money.' So it is immaterial as to what character of currency or money he received on the check, as there is no question but that the article received from the bank on the check circulated as money. The only question presented is that, defendant receiving a check on the bank, and which he cashed at the bank, as shown by the evidence, does it support an allegation that he obtained money from F. D. Love? The facts show that defendant and Mr. Love went to the bank, and, after obtaining the information desired, Mr. Love gave checks in payment of a note due by defendant to the bank, and gave him a check for $80, which was immediately cashed by the defendant, in the presence of Mr. Love. We hold that this was obtaining money from Mr. Love as charged in the indictment."

In King v. State, 66 Texas Crim. Rep., 397, 146 S. W., 543, in referring to the question involved in the present prosecution, this court said: "But, if the proof had shown that appellant received a check on the bank which he cashed at the bank, article 945 of the Penal Code providing that 'within the meaning of money, as used in this chapter, are included also bank bills or other circulating medium current as money,' and there would be no variance in the proof and the allegation." See, also, Raymond v. State, 116 Texas Crim. Rep., 595, 33 S. W. (2d) 192. In the well considered case of State v. Detloff, 201 Iowa, 159, 205 N. W., 534, the Supreme Court of Iowa dealt with the question of variance in a swindling case under conditions similar to those found in the present record. Among the cases cited in support of the conclusion that no variance was presented where the indictment alleged the acquisition of money

and the proof showed the obtaining of a check which was cashed at the bank upon which it was drawn, the court cited the cases of King v. State, supra, and Robinson v. State, supra. We quote from the language of the court as follows:

"With respect to the question of variance, we have heretofore, in the Gibson Case (132 Iowa, 53, 106 N. W., 270), recognized that there is a conflict of authority. In the instant case there can be no doubt but that the actual cash was received by the appellant when he personally received payment of the amount of the check or draft at Sioux City from the bank on which it was drawn, so that there is no question here of the agency of an intermediate bank where the check was deposited, a question that has been considered by some courts as controlling. People v. Dimick, 107 N. Y., 13, 14 N. E., 178. In the Gibson Case, after adverting to the conflict in the adjudicated cases, and suggesting that the intermediate bank in which the defendant had deposited the check was to be considered his agent for the purpose of collecting it, and that the money was received by the defendant when the check was cashed by the bank upon which it .was drawn, we said:

" 'But, however this may be, there was no variance under any of the cases to which our attention has been called, for the reason that defendant did in fact receive money from the plaintiff (the party defrauded); the check simply being an instrument through which the money was received.'

"This reasoning and this conclusion find ample support in the following cases, among others that might be cited: People v. Leavens, 12 Cal. App., 178, 106 P., 1103; People v. Whalen, 154 Cal., 472, 98 P., 194; Hunt v. State, 72 Ark., 241, 79 S. W., 769, 65 L. R. A., 71, 105 Am. St. Rep., 34, 2 Ann. Cas., 33; State v. Palmer, 40 Kan., 474, 20 P., 270; People v. Hoffman, 142 Mich., 531, 105 N. W., 838; State v. Stewart, 9 N. D., 409, 83 N. W., 869; State v. Germain, 54 Ore., 395, 103 P., 521; State v. Mason, 62 Mont., 180, 204 P., 358; Rand v. Commonwealth, 176 Ky., 343, 195 S. W., 802; State v. Chick, 282. Mo., 51, 221 S. W., 10; State v. Rosenheim, 303 Mo., 553, 261 S. W., 95; King v. State, 66 Texas Crim. Rep., 397, 146 S. W., 543; Robinson v. State, 63 Texas Crim. Rep., 212, 139 S. W., 978.

"In the light of these holdings, we see no occasion to resolve in favor of the accused, who actually received the money upon the check of the party defrauded, the doubt suggested in the Gibson Case, whether the rule there announced would apply in case of an instrument not amounting to an equitable assignment of the funds of the drawer, or to find in the fact that, under the Negotiable Instruments Act (Code 1924, sec. 9461, et seq.), a check is not such an assignment, any reason for a distinction. It is looking to form rather than substance, to technicality rather than fact, to say that one who obtains the money of another by false pretenses, through the instrumentality of a check of the party defrauded, upon which

he receives the money, obtains only the check and not the money. The question of variance was not involved in the case of State v. Smith (162 Iowa, 336, 144 N. W., 32, 49 L. R. A. (N. S.), 834), supra, and what is there said was with reference to the matter of jurisdiction only."

It is observed that the opinion in Lieske v. State, supra, fails to show that the accused in fact received the money on the check he obtained. Hence it would not appear that the check was simply an instrument through which the money was received. In the present case and the other cases to which reference has been made, the checks were cashed and the money obtained. Thus the checks were simply used as instruments through which the money was received. Disclaiming any intention to hold that a variance would not be presented in a case where it was alleged that money was acquired and the proof merely showed that a check was obtained without further showing that the money was obtained by cashing the check, the opinion is expressed that the facts of the present case bring it within the holding of Robinson v. State, supra, and King v. State, supra. These cases and the present case are distinguishable upon the facts from Lieske v. State, supra, in that in Lieske's Case it was not shown that the check was cashed, whereas in the present case and the other cases referred to, the proof showed that the checks were in fact cashed and the money obtained. We are constrained to overrule appellant's contention that there is a fatal variance.

The judgment is reversed and the prosecution ordered dismissed.

*Reversed and prosecution ordered dismissed.*

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.